IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

REVAH ANZALDUA
1 St Martins Avenue
Haddon Heights, NJ 08035

          Plaintiff,

v.

WHYY, INC.
150 North 6th Street
Philadelphia, PA 19106

          Defendant.

CIVIL NO. _____

JURY TRIAL DEMANDED

---

## COMPLAINT- CIVIL ACTION

Plaintiff Revah Anzaldua ("Plaintiff"), by and through her undersigned attorney, for her Complaint against Defendant, WHYY, Inc. ("Defendant"), alleges as follows:

## INTRODUCTION

1. Plaintiff brings this Complaint contending that Defendant has improperly failed to pay her overtime compensation pursuant to the requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. § 333, *et seq.* Plaintiff also contends that Defendant interfered with the exercise of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* and retaliated against Plaintiff for attempting to exercise her rights under the same in violation of the FMLA. Finally, Plaintiff contends that Defendant discriminated against her and ultimately terminated her employment because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (the "ADEA").

## PARTIES

2. Plaintiff Revah Anzaldua is a citizen of the United States and New Jersey, and currently maintains a residence at 1 St. Martin's Avenue, Haddon Heights, NJ 08035.

3. Defendant WHYY, Inc. is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a registered office address of Independence Mall West, 150 North 6th Street, Philadelphia, PA 19106.

## JURISDICTION AND VENUE

4. On or about November 7, 2014, Plaintiff filed an amended charge of discrimination against Defendant with the United States Equal Opportunity Commission (the "EEOC"). Plaintiff's charge with the EEOC was docketed as EEOC Charge No. 530-2014-02957. Plaintiff's amended charge was filed within the applicable time limited associated with this dispute.

5. The time period applicable for the exhaustion of administrative remedies under the ADEA has elapsed.

6. Plaintiff has therefore exhausted her administrative remedies with respect to her ADEA claims and has complied with all conditions precedent to maintaining this action.

7. This court has jurisdiction over this action pursuant to 29 U.S.C. § 216(b), which provides, in relevant part, that suit under the FLSA "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction." See 29 U.S.C. § 216(b).

8. This Court also has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims because those claims arise out of the same nucleus of operative facts as the FLSA claims.

10. The venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the parties reside in this judicial district, doing business therein, and the unlawful practices of which Plaintiff is complaining were committed in the Commonwealth of Pennsylvania.

## GENERAL FACTUAL ALLEGATIONS

11. Paragraphs 1 through 10 are hereby incorporated by reference as though the same were more fully set forth at length herein.

12. Plaintiff, Revah Anzaldua, is female, was born on April 28, 1951 and is currently sixty-three (63) years old.

13. In 2007, Plaintiff was hired as a Manager of Corporate Sponsorships.

14. In that capacity, Plaintiff was charged with two major responsibilities: the planning and coordination of the WHYY President's Dinner, a high-profile annual awards ceremony and fundraiser attended by hundreds of leaders within the business, cultural, and political community, and the soliciting and securing of Corporate Challenges, which, upon information and belief, are grants by companies during WHYY membership donation drives which are designed to encourage contribution by audience members.

15. In or around 2008, Plaintiff's role was expanded to include the duties of an Underwriting Executive without any increase in base salary.

16. In or around 2010, in conjunction with the opening of the Dorrance H. Hamilton Public Media Commons, Plaintiff's job title was changed to Manager of Corporate Affairs, and Plaintiff was assigned the additional tasks of booking clients for use of the new venue and coordinating events.

## FACTS RELEVANT TO PLAINTIFF'S FLSA/PMWA CLAIMS

17. Paragraphs 1 through 16 are hereby incorporated by reference as though the same were more fully set forth at length herein.

18. Defendant is a "private employer" and covered by the FLSA.

19. Plaintiff was employed by Defendant during all relevant times hereto and, as such, is an employee entitled to the FLSA's protections. See 29 U.S.C. § 203(e).

20. From 2010 to around June 2013, in her role as Manager of Corporate Affairs, Plaintiff's job duties chiefly consisted of planning and coordinating the WHYY President's Dinner, soliciting and securing Corporate Challenges from companies for WHYY membership drives, establishing and maintaining underwriting relationships with clients, and booking and coordinating events at the Public Media Commons.

21. In each of these roles, Plaintiff's primary duties were essentially sales and working the phones. In this regard, Plaintiff was to contact individuals and companies who had expressed an interest in WHYY and/or public media, and attempt to secure donations, grants, and underwriting support for Defendant.

22. The same applied to Plaintiff's involvement with the WHYY President's Dinner, where, in addition to coordinating with honorees and on-stage talent, Plaintiff was responsible for securing donations from corporate sponsors, selling advertising space on the program book, and selling tickets to the event.

23. While Plaintiff was officially scheduled to work from 9:00 am to 5:00 pm, Monday through Friday, Plaintiff was often forced to come in early and to stay late, beyond her scheduled shift, in order to keep up with her workload.

24. Plaintiff's responsibilities with respect to events at the Public Media Commons often required her to arrive at work as early as 5:00 am in order to coordinate with caterers and other vendors for morning events.

25. Moreover, when Plaintiff was not required to arrive at 5:00 am, she was still required to attend a planning meeting at 9:00 am each week.

26. In both cases, Plaintiff would perform work until and through the start of her scheduled shift, including reading and responding to emails from potential clients and donors, and filling out paperwork.

27. Plaintiff was also required to attend and coordinate events booked at the Public Media Commons, which were often held in the morning or evening, before and after her scheduled shift.

28. Moreover, Plaintiff was often compelled to remain at work after the end of her scheduled shift in order to follow up on correspondence with potential donors and underwriting clients, take phone calls, and complete time-sensitive accounts receivable paperwork necessary to process recent transactions.

29. As the result of these responsibilities, Plaintiff routinely performed five (5) to ten (10) hours of compensable work, per week, after the conclusion of her scheduled forty-hour, 9:00 am to 5:00 pm shift.

30. Defendant, including Plaintiff's supervisor Roseann Oleyn ("Ms. Oleyn"), was aware that Plaintiff was arriving early and staying late to perform the aforementioned compensable work.

31. Indeed, upon information and belief, two members of Defendant's on-air talent, including Dave Davies (senior reporter at WHYY-FM) and Jo Ann Allen (formerly the host of

WHYY's Morning Edition, which airs live at 6:00 am), often remarked to Plaintiff about how she was "always around" before and after normal working hours, and joked with Plaintiff, asking, "Do you ever leave?!"

32. From January 2012 to around June 2013, Plaintiff routinely worked approximately fifty (50) to sixty (60) hours per week, on average. On occasion, Plaintiff would work in excess of sixty (60) hours per work week.

33. Despite the fact that Plaintiff worked in excess of 40 hours per week, Plaintiff did not receive any compensation and/or overtime compensation for work performed in excess of forty (40) hours per week. Plaintiff was paid only a weekly salary regardless of the number of hours actually worked, plus commission.

34. Defendant classified Plaintiff as "exempt" under the FLSA and PMWA, and therefore determined that Plaintiff was not entitled to overtime compensation.

35. Defendant unlawfully misclassified Plaintiff as "exempt." Plaintiff was not exempt from receiving overtime compensation.

36. Plaintiff did not have the authority to hire and fire other employees employed by Defendant. Thus, Plaintiff was not exempt from overtime compensation pursuant to the exemption for executive employees under the FLSA/PMWA.

37. In addition, since Plaintiff was required to carry out her primary job responsibility, which was effectively sales, at Defendant's offices during certain hours of the day, Plaintiff was not exempt from overtime compensation pursuant to the Outside Sales exemption under the FLSA/PMWA.

38. Plaintiff did not generally exercise independent judgment or have discretion to act without immediate supervision as to matters of significance to the business. Rather, Plaintiff

spent most of her time on the phone communicating with donor-clients and underwriters about the various options available to them pursuant to Defendant's policies, facilitating communications with individuals interested in attending, advertising through, or sponsoring the WHYY President's Dinner, and filling out routine paperwork. Thus, Plaintiff was not exempt from overtime compensation pursuant to the exemption for administrative employees under the FLSA/PMWA.

39. Finally, there are no other exemptions under the FLSA and/or PMWA which could arguably be applicable to Plaintiff.

40. Accordingly, Plaintiff was, within the meaning of the FLSA and PMWA, a non-exempt employee of Defendant.

41. Defendant failed to pay Plaintiff at a rate of 1.5 times her regular rate of pay for each hour she worked in excess of forty (40) hours in a work week.

42. As a result of Defendant's aforesaid illegal actions, Plaintiff has suffered damages.

### FACTS RELEVANT TO PLAINTIFF'S FMLA CLAIMS

43. Paragraphs 1 through 42 are hereby incorporated by reference as though the same were more fully set forth at length herein.

44. From the beginning of her employment with Defendant in 2007 until around mid-2013, when her husband was diagnosed with stage four, metastatic lung cancer, Plaintiff received positive performance evaluations, no discipline, generally achieved or exceeded her annual sales targets, and received significant praise from members of management and clients alike.

45. On or around July 8, 2013, Plaintiff, who had begun to treat with a psychiatrist for severe depression and anxiety resulting from, among other things, her husband's own serious

medical condition, was forced, because of her serious medical condition, to take the rest of July and part of August off from work.

46. Plaintiff requested and was approved for leave under the FMLA to care for her own serious health condition from July 18, 2013 to August 9, 2013.

47. By email dated February 18, 2014, Plaintiff's Supervisor, Ms. Oleyn, stated that she was "concerned about . . . the amount of time [Plaintiff had] taken off," including, presumably, the time Plaintiff took off pursuant to the FMLA to care for her own serious health condition.

48. In April 2014, Plaintiff's husband's health began deteriorating rapidly.

49. Plaintiff requested and received approval for leave to take care of her ailing husband from April 23, 2014 to May 11, 2014.

50. On or around April 23, 2014, Plaintiff husband was hospitalized. He was soon moved into hospice care, where he eventually passed away on May 3, 2014.

51. Plaintiff returned to work on May 12, 2014, just four days after her husband's funeral.

52. The circumstances of Plaintiff's husband's passing exacerbated Plaintiff's medical issues, which included anxiety, depression, hypertension, and insomnia.

53. In or around August 2014, Plaintiff began experiencing episodes of severe insomnia and began to suffer from anxiety attacks.

54. On August 8, 2014, during a routine physical exam, Plaintiff presented with highly elevated blood pressure, and Plaintiff's doctor advised Plaintiff that she was at high risk of a stroke.